Our fourth case for this morning is Cojocari v. Attorney General Sessions. Mr. Davis. Good morning, Your Honors. May it please the Court and the Counsel, my name is Howard Davis. I'm representing the petitioners Vladimir Cojocari and his wife Veronica Moraru. This case involves an asylum case about problems that Mr. Cojocari experienced in Moldova because of his involvement in a political opposition group. The judge, immigration judge Paris Guzman, denied the application primarily based on an adverse credibility finding with regard to the testimony and also found that the corroborating evidence, which there was quite a bit, did not rehabilitate the testimony and she also denied the cat. Let me ask you a question about that final hospital stay where we have pretty uncontrovertible evidence that he's en route out of Moldova on November 5th They don't believe that he was even in the hospital. Do they believe that the whole certificate is phony? Or is the debate just about whether he remembers that he leaves, is his explanation plausible for mixing up whether it's the 6th or the 5th? Your Honor, the whole debate really was about the dates. So there's no statement, I'm finding you not credible or I'm finding this corroborating evidence to be insufficient because although I've been proffered a hospital certificate, I think it's phony. No, there was no statement about phoniness. She did, the judge did have problems with, there were three hospital records related to that last incident. The very third one, the third one, she did not mark into evidence, she just marked for identification. But really, so the focus was on the two other ones and these were all admitted into evidence and nobody raised any issues that these were not authentic or they were fake. So I take it your position is that although there's some confusion about November 5 and November 6 on his part, that it's immaterial since it's pretty incontrovertible that it is in fact the 5th of November that he's traveling. Correct, and if the, also if the, yeah, that is, that's correct. So what about his inability to remember whether he's actually in the hospital or whether he was an outpatient? You know, this is one of the interesting things is, Your Honor, is that I don't think that that was the issue with the judge. When you look in the adverse, in the analysis section of the adverse credibility, it's not really, the judge doesn't mention it. In an earlier part of the decision in a footnote, she kind of mentions it, but that's not really an issue with her. I know that the, I think that the board mentioned it, but the board can't make a new factual basis for an adverse credibility finding on appeal. So that was not really an issue with the judge. Her focus was on the dates and, you know, she had the problems with the medical records in general that she talked about. She has some problems with the medical records, and I think the other big problem she has is with this August 28, 2009 date when he's at the AES. Yeah. And he thinks he gets this certificate saying that he's a student, and he's just left wordless practically at the one round of the hearing where she says the certificates date October 16th, and he's talking about August the 28th. He has absolutely nothing to say about it until, you know, with a new lawyer and all sorts of other time to think about it, and then he comes up with another story 11 months later or whatever it was, something like that, a while later. So, I mean, the judge is thinking, you know, well, what are you? So what explains this fuzziness about the student status? Well, I think one of the- And why, and I guess the real question is why was this not something, whether you think it's persuasive or I think it's persuasive, why isn't it something that the immigration judge was entitled to weigh negatively? I think one of my problems with this whole thing about the document, first of all, this is that, yes, the judge may, I mean, under real ID, the judge is a little more open to these factors. One of my problems is that the judge doesn't really talk about what is the relevance to this. If the issue is whether or not he was at AES on the date that he was picked up, well, we have his testimony, and we also have the police certificate that states that he was picked up, he was arrested, he was encountered on the premises of AES. So it doesn't seem to me that the judge does a real weighing. This is actually one of my general problems with this case is that the judge, when you take a look at the analysis here, it's really a listing of her problems, but no real analysis. And under real ID, you're supposed to do a totality of the circumstances and all relevant factors. Well, why not take a look at, in addition to the negative, that is, where Mr. Kojikari's testimony and other things clash, take a look at where they're actually consistent. And with regard to that date, I mean, he testified he was there on campus. The police reports back that up. I mean, why not? And then do a real weighing. This is something that the judge just doesn't do, and the board doesn't really help much either. I mean, I have to say, as someone who has done asylum cases, this is one of the best documented asylum cases I've seen. So, yes, the judge could use it as a negative, but she has to weigh it against everything else. I take it the record does not include anything like X-rays that would show that the ribs were broken or that the hand was broken? That is either from Moldova or, let's say, down here to see. If the ribs had been broken, it would not be unusual for that to be evident on an X-ray taken today. Right. As far as I can tell, there was nothing in the record, but I don't think that that, I mean, I don't think that. No, I mean, I'm just curious. I mean, if I was doing it, I might have done it, but, you know, that's. Could you explain to us the difference in your perspective on the difference between the hospital records that were put into evidence and this personal medical book that apparently is kept in Moldova? You know, there was not, I mean, again, one of the problems with the case, Your Honor, is that the judge just simply assumed that the medical record, the medical book, would be the better evidence. Now, whether or not that's the better evidence is required when I decided to demolish it, but it's just speculation. Have you seen it? No. I mean, I'm, you know, I'm not sure. If we were to remand it, is there any reason that couldn't be obtained? As far as I know from what I see from the record, you know, it appeared that his mother, it was with his family in Moldova. So, in other words, yes, it could be. Yes, yes. I'm sorry I didn't. But without a 100% guarantee. Yeah, I don't want to speak for my client, but I'm just going based on the record. Yeah, okay. I think I. If you'd like to save a minute, that's fine. Yeah. I have a question I'm going to ask your opponent that either one of you could answer. Mr. Tennyson. So this is a random question, but it's related to this medical book. And it's also related to why one might rather have a hospital certificate than the medical book. So my understanding from this record is that this medical book is something that the doctors jot down whatever they've done over the years. And without maligning an entire profession, I want to say that doctors' handwriting is often not the easiest to read. And I'm not sure whether Moldova is still using the Cyrillic alphabet or not. But if a rational person could think that a printout of a hospital record that would be easy to translate might be a lot easier than somebody's hand scratches in Cyrillic. So I'm not sure that I would draw any negative inference right at the moment from the fact that these records came from the hospital. But more importantly, I could find nothing from the immigration judge to the effect that there was any question that he had spent time in the hospital. Quibbling about November 5th or 6th struck me as completely irrelevant since it was very clear from the government's testimony that it was the 5th. The truth is when you're traveling overseas, as he was doing, as one who's done that many times, you can get mixed up as to what day it was anyway. You leave the United States on Tuesday and you land in China and all of a sudden it's Thursday and you don't know what you're doing. So a lot of these things that are seemingly discrepancies really don't look as though they're material. And so I'm going to ask you, clearly after the REAL ID Act, it doesn't have to, quote, go to the heart of the case. But I think it still needs to be material. Something utterly irrelevant couldn't be used, could it, as some evidence to undermine someone's credibility? Right, Your Honor. I mean, something that was absolutely trivial shouldn't be put aside, right? Okay, so good. We can at least get that far. We can get that out of the way. Yeah. But there's a reason why the date – well, first, let me go to the date. Why does it matter? Why does it matter? Because it's clearly the 5th, right? There's no question. It's clearly the 5th when he – And he didn't remember that. He didn't remember if it was the 5th or the 6th. Right. And the record says the 6th from his hospital. Right. I mean, one of the things is that early on he says – when he's confronted with this he goes, I made a mistake. It was the 5th, right? And he has the documents from the hospital that – well, the original document doesn't say. He says he's treated on the 28th. The second document says he's treated through the 6th. And then finally, the last one that he produces in September states that, well, he was supposed to be there through the 6th, but in fact he left the 5th. So we've got three different kinds of medical records here. Is it possible he's going in and out of the hospital? The question – the board actually addressed this. The immigration judge, as counsel said, didn't focus on when he was or wasn't out of the hospital. The board noted in finding – in discussing the testimony with regard to the October 25th incident and all of the follow-on from that, the board questioned whether or not he was in the hospital or wasn't in the hospital. His affidavit in support of his asylum application, he doesn't mention that he's in the hospital the whole time. And in fact, the medical – As an outpatient, of course, it all depends what you mean by in the hospital. Are you sleeping there that night or are you just going and somebody's checking your bandages? Correct, Your Honor. But interestingly, there is this – what he effectively says is that he was – and this is at the record, I think around 206 to 208. So he's at the hospital and that his parents came to get him. And the way in which the discussion proceeds indicates that he's there the whole time from the 28th through the date he leaves. It's only when he comes back later with a new testimony that he presents that he was an outpatient, that he was there, that he would go every day to check in and have his IV changed and all of that. So the date that he comes and the date that he goes is important because if he's an inpatient this whole period through November the 6th, well, that's not possible. If he's an outpatient coming out, coming in and going out, maybe he can go in and have, say, for example, a cast on his right arm removed and then go from there to – and then go from there on the bus to the Ukraine. So let me just try – I think there are a few things, Mr. Tennyson, that are not disputed here, right? We have a timely claim for asylum, not just a sort of desperate defensive measure, right? That is correct. We've got a plaintiff or petitioner who was a member of political opposition in a country where the political opposition is persecuted, right? He has a card that indicates that he is a member of political opposition. And the immigration judge credited that, correct? Right. That is correct, Your Honor. We also have, I believe, undisputed evidence that the petitioner was in police custody at the times and places that he claimed, correct? That is not something that's been found by the immigration judge. And that's not my question. The question is, is there any dispute about it? I would say potentially yes, Your Honor. Why? If he has been found not credible and the documentation he has presented is not credible, there becomes a question as to whether or not, say, for example, not just the medical records but also the police records that he presents are fabricated. So the government's theory is that this whole array of police and hospital records is just a fabrication and the discrepancies in dates show the incompetence of the person who put this story together. Is that a theory? That is correct, Your Honor. But the immigration judge never says that. That's extraordinary because I thought we had pretty clear evidence that the plaintiff needed and received medical care for traumatic injuries at these times and places associated with the police custody. But you want to say no? I want to say no. Implicit in the immigration judge's questioning of the medical records, of the police documents, and of the letters that were provided by his attorney is a finding that those are not reliable. But what does that mean? No one has said that they are forged documents, that they are created documents. And immigration judges have no hesitation in saying that sort of thing when that's what they think. They'll send them off for some test of authenticity. You've probably been involved in cases where that's happened. You can think about an adverse credibility finding in two ways. You can think about it as being a finding that a person doesn't know what they're saying, right? That the statements that they make or the documents they present are neutral with regard to the things to which they testify. Well, I think actually this immigration judge looks at these documents and says they're not a good enough match with what he has to say. It's not that the documents themselves are bad documents, but I don't think the immigration judge thinks it connects the dots in the right way. But if the immigration judge had thought, for example, that he had been, that these documents, say the police documents, were sufficient. At least as to some things, like was he arrested on August the 23rd? Right, and what were the bases for those arrests? If those were sufficient, then you would also be able to, you know, then the immigration judge might also, and I don't want to put any words in the immigration judge's mouth, but it may very well be the case. You're actually not allowed to put words in the immigration judge's mouth. I'm not allowed to, I'm a channery, right? So this might be an instance in which we look to what the board did to make sure that this is cleared up. Because the board can come back and, even though the board can't make the adverse credibility finding, it can review it. And here the board, although it only spoke to the medical documents, did affirm what the immigration judge said and found that there was no credibility, and it was an across-the-board adverse credibility finding. Well, what do we do with an immigration judge who says in a case alleging and documenting police custody and beatings? Well, I don't find the petitioner credible because the police say they had legitimate reasons to arrest him. That's our basis for discounting his credibility. Right. That seems extraordinary. Especially when they said it was insubordination. Right, if they're insubordination and things like that. The government freely concedes that. In the abstract, if that was it and you looked at it, that would be a sufficient reason to look at OYO, to be a little leery of what the immigration judge said. Well, we also have the immigration judge, I think, criticizing Mr. Kojicari's credibility because over the course of the proceeding he kept digging for additional documents to corroborate. Why does that rationally undermine his credibility? Well, if you take the medical documents, I hope I don't go too far. If you take the medical documents, it's because when he comes back, each time the medical documents are different. But are they different, importantly?  Let me go through the differences. If you look at the original documents, have him with a dislocated shoulder. And they have him, if I remember correctly, and I could be incorrect about this. It's a dislocated shoulder versus an upper right radial break and soft tissue contusions versus a hematoma. That's not a big difference, especially in a medical system that may be a little sketchy. Right, so you've got the difference between what is a right upper shoulder or a radial break. No, it's the upper part of the arm. The radius is a bone in your forearm. But radial is also a kind of break, right? So there's that. There's also the indications that he's home and at the hospital. And then there's the change in the dates at the end. All right. What was the last thing you just said? The change in the dates at the end. Well, the only change I'm wondering about, which we haven't talked about here, is the change in the regime or whatever they call it over there. It's something about, I don't know, whoever runs Moldova. It's a different entity, is it not? Right. Are you talking about today or are you talking about at the time? Well, between 2007 or 2009, whenever he left. Right. And now? And now. Your Honor, that would be outside the record, so I couldn't speak to what's going on now. Well, I mean, you're talking about going back now. Is all this going to be the same? If it goes back now, they will consider the regime as it exists now. Those kinds of documents could come in and be discussed. But I'm only wondering, as time goes by, maybe all this stuff that happened before is different people, different regime, different treatment. Maybe not. I thought the record showed that it's still very heavily communist. It's not a place you want to go. Especially in the police departments, et cetera. Right. In 2012, we have this. In fact, the police department in which he was, where he claims to have been beaten and where the immigration judge says he wasn't, in the 2012 country conditions report, we actually have information that the head of the department was fined for the activities following the, I guess it was, April 9th demonstration. The big demonstration. Yes. But on the other hand, I can't let this go without saying that the immigration judge makes a particularly, I almost want to say silly remark, on the torture part of this. After this testimony from Kotlar, thinking that torture isn't going to happen because Moldovan law criminalizes inhuman treatment and torture. And there's a sentence of prison. Well, you're probably not from Chicago, but I'm going to tell you that there was an infamous police officer here named Officer Burge who tortured people in the city of Chicago for quite some period of time. He hung them from the ceiling. He electrocuted them. He did all of the things that you would recognize as torture. And we have laws against torture in the United States, too. We actually have laws against murder, and murders happen. So it seems to me the fact that there is a law against torture doesn't get you too far. Could I just ask a follow-up? And I want to get this take on the case on the table and get your response to it, Mr. Tennyson. Yes, Your Honor. You can count these in different ways, but suppose an immigration judge offers 12 reasons for discounting somebody's credibility. Right, Your Honor. Four of them are absurd. Five of them are trivial. Three of them might carry some weight. And in other administrative law contexts in that situation, we would say, you know, maybe you could justify this finding, but this administrative adjudicator simply failed to build a coherent logical bridge between the evidence and the ultimate decision. Right, Your Honor. And that, allowing some leeway for the counting, looks like this case to me. Your Honor, if that's the way you read this case, if this is sort of a sum of the parts as opposed to a holistic finding, then if you find that these parts don't add up or that they don't add up, but given the fact that the board found this to be a totality of the circumstances case, some of these things drop out. Perhaps the board needs to figure out, you know, whether under the totality of the circumstances, the new circumstances, it is appropriate to uphold an adverse credibility finding or find it. He was not credible. Thank you. Thank you very much. Mr. Davis. Just very small. You know, in terms of the medical documents, there was really only one that was given at the very end, but all of the documents were admitted into evidence before the first merits hearing in 2013. And the government lodged no objection to their authenticity? Correct. Okay. Really, unless the court has further questions, I ask that the court reverse the adverse credibility decision and have the case sent back to the judge to look at the merits of the claim. Where are your clients now? Okay. I'm sorry? Where are your clients now? They're in the Chicago area. Okay. Thank you. Okay. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.